UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
                                  :
GAIL A. CONNOR,                   :
                                  :      Civil Action No.
              Plaintiff,          :      09-cv-1140 (NLH)
                                  :
     v.                           :      OPINION
                                  :
SEDGWICK CLAIMS MANAGEMENT        :
SERVICES, INC., et al.,           :
                                  :
              Defendants.         :
                                  :
```

**APPEARANCES**:
STEPHEN R. BOSIN
70 GRAND AVENUE
RIVER EDGE, NJ 07661-0201
*Attorney for Plaintiff Gail A. Connor*

IVAN R. NOVICH
EDWARDS, ANGELL, PALMER & DODGE, LLP
ONE GIRALDA FARMS
MADISON, NJ 07940
*Attorney for Defendant PNC Corp. & Affiliates Long Term Disability Plan*

**HILLMAN, District Judge**

Plaintiff, Gail A. Connor, seeks reinstatement of her long term disability benefits from Defendant PNC Corp. & Affiliates Long Term Disability Plan (hereinafter "Defendant").  The long term disability plan at issue is an employee welfare benefit plan governed by the Employee Retirement Income Security Act (hereinafter "ERISA"), 29 U.S.C. § 1001 et seq..  The Court is called upon to determine whether the denial of Plaintiff's long

term disability benefits was arbitrary and capricious, and, therefore, unlawful pursuant to 29 U.S.C. § 1132(a)(1)(B). Plaintiff moves for summary judgment [Doc. 23] and Defendant cross-moves for summary judgment[1] [Doc. 27].  For the reasons expressed below, the Court will grant in part and deny in part Plaintiff's Motion and deny Defendant's Cross-Motion.

**I.   JURISDICTION**

Plaintiff brought his claims pursuant to ERISA and this Court has jurisdiction over her claims under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(d)(e)&(f).

**II.  BACKGROUND**

Plaintiff, Gail A. Connor, worked for PNC Bank Corp.[2] (hereinafter "PNC") as a "Branch Manager III" from September 27, 2004 through October 10, 2006.  As an employee of PNC, Plaintiff participated in the PNC Corp. & Affiliates Long Term Disability Plan (hereinafter "Plan").  This Plan, an employee welfare benefits plan, is governed by ERISA and provides long term disability (hereinafter "LTD") benefits, of up to 70% of their base salary, to employees of PNC who are out of work for longer than ninety (90) days.  Under the Plan, a claimant is entitled to

---

[1]   In addition to its Cross-Motion for Summary Judgment, Defendant also filed two motions to seal [Docs. 31 & 34] seeking to seal its motion papers and supporting documentation, including the administrative record.

[2]   The PNC Financial Services Group, Inc. is successor to PNC Bank Corp.

receive LTD benefits when, after the expiration of ninety (90) days, he or she is "Totally Disabled" or has a "Total Disability."  Under the Plan a covered person is "Totally Disabled" and has a "Total Disability" when "because of Injury or Sickness: [t]he participant cannot perform each of the materials duties of his or her regular occupation; and [a]fter benefits have been paid for 24 months, the participant cannot perform each of the material duties of any gainful occupation for which he or she is reasonably fitted by training[,] education or experience." Plan, Doc. 30, Exhibit 4 at AR 333.

The Plan identified PNC as the Plan Administrator, and gave it discretionary authority to interpret the terms of the Plan and administer benefits.  In addition, the Plan contained a provision that permitted the Plan Administrator to "appoint or employ individuals or firms to assist in the administration of the Plan . . .". Plan, Doc. 30, Exhibit 4 at AR 344.  Pursuant to this provision, PNC entered into an Administrative Services Agreement with a third party company, Sedgwick Claims Management Services, Inc. (hereinafter "Sedgwick").  In the agreement, PNC expressly delegated to Sedgwick its discretionary authority to determine a claimant's eligibility for LTD benefits.[3]

---

[3]  Plaintiff disputes this construction of the Plan and contends, as discussed in detail below, that the Plan did not permit PNC to delegate its discretionary authority to a third party.

3

On or about January 17, 2007, more than ninety (90) days after her last day of active employment, Plaintiff filed her application for LTD benefits with Sedgwick.[4]  On her application, Plaintiff stated that she stopped working because of Systemic Lupus Erythematosus (hereinafter "lupus") and Raynaud's disease. She specifically complained that her disability caused "difficulty with movements such as walking, bending, sitting . . . standing, lifting" and using her hands. Employee Application for Benefits, Exhibit 4 at AR 307.  In support of Plaintiff's application, Stephen L. Burnstein, D.O. (hereinafter "Dr. Burnstein"), her rheumatologist, submitted a Treating Physician's Statement (hereinafter "Statement").[5]  This Statement indicated Plaintiff's primary diagnosis as lupus and secondary diagnosis as Raynaud's Disease.  Dr. Burnstein also noted that the limitations or restrictions that prevent Plaintiff from performing the essential functions of her job occur "if she is exposed to cold temperatures or cold drafts or UV light stress - physical/emotional." Treating Physician's Statement, Doc. 30, Exhibit 4 at AR 312.

---

[4]  Defendant asserts that Plaintiff's application was untimely because the Plan states that a claim for benefits must be filed no later than ninety (90) days following the date of disability.  In this matter, Plaintiff's date of disability was her last day of active employment, October 10, 2006.

[5]  This form was completed after Plaintiff's January 12, 2007 appointment.

As further evidence of Plaintiff's disability, Dr. Burnstein submitted to Sedgwick a letter he sent to her primary care physician.  In this letter, he concluded Plaintiff has rhupus[6], a condition that is a combination of rheumatoid arthritis and lupus.  To support this diagnosis, Dr. Burnstein provided both objective and subjective evidence of Plaintiff's disability.  He specifically noted that laboratory studies completed several months ago revealed that Plaintiff's double-stranded DNA was "mildly" elevated and her ANA was "positive."[7]  Doc. 30, Exhibit 4 at AR 314.  In his description of her current condition he reported "[t]here is no weakness or atrophy.  There are no abnormal NP findings.  There are no FMS tender points."[8]  Doc. 30, Exhibit 4 at AR 315.  Although Dr. Burnstein's physical examination did not reveal that Plaintiff had any tenderness, swelling, deformity or limitation of motion, his January 12, 2007 medical records noted Plaintiff's subjective complaints of joint pain, swelling, fatigue and weakness.  Finally, Dr. Burnstein indicated that in an eight-hour day Plaintiff could sit for three hours, stand for two hours, walk for one hour and view a computer

---

[6]  "Rupus" is also an acceptable spelling of the term "rhupus."

[7]  The Antinuclear Antibody Test or ANA is used as a diagnostic test for autoimmune diseases like lupus.

[8]  FMS is a shorthand term for the medical disorder known as fibromylagia.

screen for two hours.[9]

On March 15, 2007, Sedgwick informed Plaintiff that her "[m]edical information indicates" she is "unable to continue" her employment and that her benefits were approved on the "basis" of her "medical restrictions and limitations associated, but not limited to, the current diagnosis of Lupus."[10] Doc. 30, Exhibit 3 at AR 277.  The letter also conditioned Plaintiff's further receipt of benefits on her continued ability to meet the Plan's definition of "Total Disability."  It informed her that "[o]n a periodic basis" Sedgwick "will need to verify your ongoing eligibility for benefits" by "requesting information from you and your attending physicians." Id. at 278.

Several months later, on November 21, 2007, Sedgwick informed Plaintiff that "based upon a lack of current treatment information on file supportive of continuing total disability" her "claim for Long Term Disability benefits was formally

---

[9]  Based upon this observation, he concluded Plaintiff was only capable of working four hours a day and needed a break every two hours.

[10]  Sedgwick's determination that Plaintiff was disabled was with respect to the "regular occupation" definition of "Total Disability."  It did not determine whether Plaintiff was incapable of performing "each of the material duties of any gainful occupation for which . . . she is reasonably fitted by training[,] education or experience." Plan, Doc. 30, Exhibit 4 at AR 333.

suspended."[11] Doc. 30, Exhibit 3 at AR 243.  This suspension was in effect until Plaintiff or Dr. Burnstein submitted proof that she was "Totally Disabled."  On November 27, 2007, Dr. Burnstein replied to Sedgwick's letter and identified Plaintiff's prognosis for full or part-time employment as "poor."[12] Doc. 30, Exhibit 1 at AR 059.  In support this determination, he provided medical records from March 5, 2007, June 5, 2007, August 23, 2007, October 9, 2007 and November 2, 2007.

Dr. Burnstein's March 5, 2007 records indicated Plaintiff complained of morning stiffness, headaches, fatigue and some nausea.  Her physical examination revealed some warmth, swelling and tenderness in the joints of her hands and feet.  Dr. Burnstein's records, however, did not note any limitations on Plaintiff's ability to stand, sit or walk, nor did he mention any other limitations of Plaintiff.

The medical records from June 5, 2007 noted Plaintiff complained of fatigue, but admitted it was better with medication.  Plaintiff failed to report any dizziness, numbness or weakness, and her physical examination did not reveal any pain

---

[11]  On February 5, 2007, May 29, 2007, October 2, 2007, November 8, 2007 and November 12, 2007 Sedgwick requested from both Plaintiff and Dr. Burnstein additional information supportive of Plaintiff's continued disability.  Plaintiff and Dr. Burnstein failed to respond to the requests.

[12]  In this letter, however, Dr. Burnstein failed to respond to Sedgwick's inquiry regarding Plaintiff's functional status, last office visit and frequency of office visits.

or swelling.  Dr. Burnstein's records did not indicate any limitations on Plaintiff's ability to stand, sit or walk, nor did he mention any other limitations of Plaintiff.  The physician concluded that Plaintiff's rhupus was "stable" with methotrexate and plaquenil.[13] Doc. 30, Exhibit 1 at AR 071.

Plaintiff's August 23, 2007 medical records indicated she complained of fatigue.  She, however, did not report any dizziness, headache, numbness or weakness to Dr. Burnstein, nor did his physical examination of her reveal any pain or swelling.  The records also failed to note any limitations on Plaintiff's ability to stand, sit or walk.

Dr. Burnstein's October 9, 2007 medical records mentioned a rheumatoid arthritis "flare up" and that Plaintiff reported fatigue, morning stiffness, soreness in shoulders and that methotrexate was "not doing anything." Doc. 30, Exhibit 1 at AR 063.  The physical examination revealed some swelling and tenderness in the joints of Plaintiff's hands and feet.  Dr. Burnstein's records, however, did not note any limitations on Plaintiff's ability to stand, sit or walk, nor did he indicate any other limitations of Plaintiff.

Dr. Burnstein's November 2, 2007 medical records do not contain any noteworthy observations.  On December 10, 2007, Sedgwick, after receipt of Dr. Burnstein's medical records,

---

[13]  Methotrexate and plaquenil are both medications.

informed Plaintiff that it would reinstate her LTD benefits.

On February 6, 2008, Plaintiff forwarded Sedgwick medical records from her December 19, 2007 visit with Dr. Burnstein. These records indicated Plaintiff reported headaches and morning stiffness lasting approximately two hours.  Dr. Burnstein's physical examination revealed some swelling in the joints of Plaintiff's hands and feet.  Plaintiff also mentioned she experienced daily pain in the range of 6-7 on a scale of ten, but "feels better."  Doc. 30, Exhibit 1 at AR 078.  Dr. Burnstein's records did not discuss any limitations on Plaintiff's ability to stand, sit or walk, nor did he indicate any other limitations of Plaintiff.

On July 9, 2008 and again on August 6, 2008, Sedgwick reminded Plaintiff that the definition of "Total Disability" and "Totally Disabled" changes after benefits have been paid for twenty-four (24) months.[14]  According to Sedgwick, Plaintiff's eligibility for LTD benefits "in accordance with the 'Own Occupation' . . . definition of total disability will end" on January 8, 2009.  Doc. 30, Exhibit 3 at AR 227 & AR 229.  The letter further stated that beginning on January 9, 2009, in order

---

[14]  For the first twenty-four (24) months of disability, Plaintiff needed only demonstrate that she cannot perform the duties of her "regular occupation."  After benefits have been paid for twenty-four (24) months, however, Plaintiff must prove that she "cannot perform each of the material duties of any gainful occupation" of which she is qualified. Doc. 30, Exhibit 3 at AR227 & AR229.

to continue her receipt of LTD benefits, Plaintiff must establish eligibility under the "Any Occupation" definition of total disability. Id.  In preparation for this change, Sedgwick requested that Plaintiff provide additional medical information documenting her disability.

In response, Plaintiff submitted a Report of Disability dated July 30, 2008.  This report indicated "no changes" in her condition.  PNC LTD Report of Disability, Doc. 30, Exhibit 1 at AR 093.  The submission to Sedgwick also contained a July 29, 2008 Report of Disability from Dr. Burnstein.  This report indicated Plaintiff's objective symptoms of disability were "tender hand joints." LTD Report of Disability, Exhibit 1 at AR 095.  Dr. Burnstein further noted that in an eight-hour workday, Plaintiff could sit, stand and walk for one hour and that her restricted actions included "lifting/carrying, use of hands in repetitive actions, use of feet in repetitive movements, reaching above shoulder level, bending, squatting [and] crawling." Id.

On September 10, 2008, Sedgwick again requested an update from Dr. Burnstein.  Several days later, on September 18, 2008, Dr. Burnstein replied and essentially reiterated the same information he previously provided Sedgwick.  According to Dr. Burnstein, Plaintiff has morning stiffness, cannot sit or stand for more than 1-2 hours a day, has arm stiffness, has restricted motion in joints and has difficulty with fine grasping and

10

manipulation.  He then expressed his doubt that Plaintiff could return to gainful employment.  Dr. Burnstein also sent to Sedgwick the records from Plaintiff's June 23, 2008 office visit.[15]  Her medical records indicated that she complained of fatigue, morning stiffness for approximately two hours and that she "gets more frequent infections."[16]  Doc. 30, Exhibit 2 at AR 114.  Plaintiff, however, did not report any headaches, dizziness, numbness or weakness.  Her physical examination revealed tender points in the joints of her hands.  The records, however, did not note any limitations on Plaintiff's ability to stand, sit or walk, nor did Dr. Burnstein mention any other limitations of Plaintiff.

Shortly after receiving Dr. Burnstein's report, Sedgwick contacted a third-party, Network Medical Review, to independently review Plaintiff's LTD claim.  This company subsequently assigned physician Dennis Payne, Jr. M.D.[17] (hereinafter "Dr. Payne") to

---

[15]  The record is partially unclear when these medical notes were submitted to Sedgwick.  Sedgwick, however, did not log them until September 18, 2008.  The Court will, therefore, infer that it did not consider the June 23, 2008 records until September 18, 2008.

[16]  The records also noted Plaintiff experienced daily pain in the range of 5-6 on a scale of 10.

[17]  According to Plaintiff, from January 1, 2005 to October 7, 2008, Dr. Payne only approved 1 of 5 claims, or 20% of all claims submitted to him.

review the LTD claim.[18]  Although he never examined Plaintiff,
Dr. Payne reviewed her medical files.  After this review, he
concluded that "[t]he medical record data do[es] not contain
specific details of any objective findings of systemic lupus."
Doc. 30, Exhibit 2 at AR 128.  In reaching this conclusion, Dr.
Payne considered that Plaintiff had a positive ANA and positive
double-stranded DNA, but that the overall "symptomatology
described" was "not consistent with a connective tissue process."
Id. at 128-29.  Therefore, according to the physician, Plaintiff
presented no medical evidence that she was disabled from lupus or
any other rheumatological disease.[19]  Dr. Payne's report did not
specifically discuss the rhupus diagnosis.

On October 24, 2008, Sedgwick informed Plaintiff that, as of
September 30, 2008, she was no longer eligible to receive LTD
benefits because she was no longer "Totally Disabled" under the
terms of the Plan.  The denial letter reiterated the findings of
Dr. Payne's report and largely focused on his conclusion that
Plaintiff lacked objective medical evidence of a disability.

---

[18]  Dr. Payne's Report contains a conflict of interest
statement indicating that his compensation is not dependent on a
specific outcome of the review.

[19]  Dr. Payne never spoke with Dr. Burnstein concerning
Plaintiff's condition.  When Dr. Payne contacted Dr. Burnstein,
he was told that he needed Plaintiff's written authorization to
speak with Dr. Burnstein about her medical history.  Apparently,
Dr. Payne never received the authorization and did not directly
speak with Dr. Burnstein about Plaintiff's condition.

Although Sedgwick's letter informed Plaintiff that she had a right to appeal within 180 days, it did not specifically inform her what type of evidence she must present on appeal to perfect her LTD claim.[20]

Shortly after the receipt of Sedgwick's denial letter Plaintiff retained counsel.  On January 16, 2009, Plaintiff's attorney appealed Sedgwick's October 24, 2008 decision.  In addition to the appeal letter, Plaintiff submitted (1) a letter from Dr. Burnstein dated December 23, 2008,[21] (2) a decision of the Social Security Administration (hereinafter "SSA") dated April 7, 2008, granting Plaintiff disability benefits,[22] (3) a copy of Plaintiff's prescription records and (4) a statement from

---

[20]  After an inquiry from Plaintiff's counsel, Sedgwick told him that Plaintiff should provide "any medical records – such as office visits, test results, lab work, diagnostic studies, x-rays, MRI's, blood work, etc, not have been provided during the claim review." Doc. 30, Exhibit 2 at AR 152.

[21]  This letter essentially reiterated the same findings Dr. Burnstein previously made.  He opined that Plaintiff does not merely have systemic lupus, but rather "a combination of systemic lupus and rheumatoid arthritis." Doc. 30, Exhibit 2 at AR 160-61. In support of this assertion, Dr. Burnstein detailed the objective symptoms of Plaintiff's rhupus, which included the presence of anticardiolipin antibodies, positive antinuclear antibody, positive double stranded DNA antibody, swelling, tenderness and stiffness.

[22]  On May 1, 2007, the SSA informed Plaintiff she was not eligible to receive disability payments because she was not disabled.  However, approximately one year later on April 7, 2008, an administrative law judge reversed the agency's decision and concluded Plaintiff was disabled and entitled to disability benefits.

Plaintiff containing her self-reported subjective side effects from her medications.

After receipt of Plaintiff's appeal, Sedgwick again contacted Network Medical Review to independently review her LTD benefits claim.  The company assigned Dr. Tanya Lumpkins, M.D.[23] (hereinafter "Dr. Lumpkins") to conduct the review.[24]  Although she never examined Plaintiff, Dr. Lumpkins concluded, after a through review of her medical history, that Plaintiff was not disabled because her medical records failed to "substantiate the severity of either systemic lupus erthematosus or rheumatoid arthritis." Doc. 30, Exhibit 2 at AR 200.  In support of this conclusion, Dr. Lumpkins focused on a lack of objective evidence about the severity of Plaintiff's lupus and rheumatoid arthritis.

On March 6, 2009, Sedgwick upheld its denial of Plaintiff's appeal.  Approximately one week later, on March 12, 2009, Plaintiff initiated this lawsuit.  Over one year later Plaintiff moved for summary judgment.  Shortly thereafter, Defendant filed its cross-motion for summary judgment.

---

[23]  According to Plaintiff, from January 1, 2005 to February 10, 2009, Dr. Lumpkins only approved 3 of 11 claims, or 27.7% of all claims submitted to her.  Based upon this calculation and the approval rate of Dr. Payne, Plaintiff concluded that a claimant has only a 5.5% chance of being approved by both reviewers.

[24]  Dr. Lumpkins's Report contained a conflict of interest statement indicating that her compensation was not dependent on a specific outcome of the review.

## III. DISCUSSION

### A.   Standard for Summary Judgment

Summary judgment is appropriate where the Court is satisfied that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(c).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id.  In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp., 477 U.S. at 323.  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise,

15

specific facts showing that there is a genuine issue for trial.
Id.  Thus, to withstand a properly supported motion for summary
judgment, the nonmoving party must identify specific facts and
affirmative evidence that contradict those offered by the moving
party.  Anderson, 477 U.S. at 256-57.  A party opposing summary
judgment must do more than just rest upon mere allegations,
general denials, or vague statements.  Saldana v. Kmart Corp., 260
F.3d 228, 232 (3d Cir. 2001).

**B.   Timeliness of Plaintiff's Claim**

Defendant contends summary judgment should be entered on its
behalf because Plaintiff filed her initial claim for LTD benefits
approximately eight days late.  Thus, according to Defendant, she
failed to timely file her claim, as required by the Plan.
Plaintiff seemingly acknowledges her untimeliness.  She argues,
however, that because her failure to timely file the benefits
claim never formed a basis for Sedgwick's denial of the claim,
Defendant is barred from raising untimeliness as a *post hoc*
justification for the denial of the LTD benefits.  In response,
Defendant postulates that, in an attempt to modify the terms of
the Plan, Plaintiff's argument improperly raises principles of
waiver and estoppel.

The Court disagrees with Defendant's characterization of the
timeliness issue.  Our role in the present matter is to determine
whether Sedgwick abused its discretion and improperly denied

Plaintiff's LTD benefits claim.  To resolve this inquiry, the Court examines Sedgwick's rationale for denying the benefits claim, as evidenced by the administrative record and explained in its denial letters to Plaintiff.  Although Defendant now attempts to raise a timeliness issue with Plaintiff's claim, Sedgwick never denied her claim on that basis.  Rather, it was denied on substantive grounds entirely unrelated to timeliness. Furthermore, any concern over timeliness is absent from the administrative record and both of the denial letters sent to Plaintiff. *See* Haisley v. Sedgwick Claims Mgmt. Servs., Inc., ____ F. Supp.2d ____, No. 08-1463, 2011 WL 818669, at * 12 (W.D.Pa. March 2, 2011) (concluding that no finding of untimeliness was made by the plan administrator during the administrative proceedings, and therefore, defendant cannot now "turn around and rely on [untimeliness] as a basis for defeating" the ERISA claims).

The Court will not permit Defendant to utilize a timeliness argument now, at this stage of the litigation, as a *post hoc* rationalization for Sedgwick's denial of benefits. *See* Skretvedt v. E.I. DuPont de Nemours & Co., 268 F.3d 167, 178 n. 8 (3d Cir. 2001) ("[I]t strikes us as problematic to . . . allow the administrator to 'shore up' a decision after-the-fact by testifying as to the 'true' basis for the decision after the matter is in litigation, possible deficiencies in the decision

17

are identified, and an attorney is consulted to defend the
decision by developing creative post hoc arguments that can
survive deferential review . . . . To depart from the
administrative record in this fashion would, in our view, invite
more terse and conclusory decisions from plan administrators,
leaving room for them-or, worse yet, federal judges-to brainstorm
and invent various proposed 'rational bases' when their decisions
are challenged in ensuing litigation") (quoting Univ. Hosps. of
Cleveland v. Emerson Elec. Co., 202 F.3d 839, 848 n. 7 (6th Cir.
2000)); see also Nair v. Pfizer, Inc., No. 07-5203, 2009 WL
1635380, at * 10 (D.N.J. June 10, 2009) ("[T]he legal authority .
. . militates against permitting defendant employers to 'shore
up' a denial of benefits with additional bases after the employee
has initiated suit under ERISA to recover those benefits").  The
time to deny Plaintiff's claim on the basis of untimeliness has
come and has long gone. See O'Hara v. Nat'l Union Fire Ins. Co.
of Pittsburgh, PA, 697 F. Supp.2d 474, 478 (W.D.N.Y. 2010),
overruled on other grounds ____ F.3d _____, 2011 WL 1405448 (2nd
Cir. 2011) (concluding that the plan administrator's failure to
raise plaintiff's "allegedly untimely notice of claim as a
defense, despite having all of the relevant facts before it and
ample opportunities to assert it . . . did operate as a knowing
waiver of that defense").  The Court, therefore, concludes
Defendant cannot raise a timeliness defense because Plaintiff's

claim was never denied on that basis.

### C. Standard of Review for Plaintiff's Claim

ERISA provides that a plan participant or beneficiary may bring a suit "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). The statute, however, does not specify a standard of review for an action brought pursuant to § 1132(a)(1)(B). Mitchell v. Eastman Kodak Co., 113 F.3d 433, 437 (3d Cir. 1997). The Supreme Court addressed this issue and opined that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). When the plan affords the administrator with discretionary authority, courts must review the benefit decision for an abuse of discretion.[25] Firestone Tire & Rubber Co., 489 U.S. at 115.

In the present matter, Plaintiff contends the abuse of discretion standard is inappropriate because PNC, the Plan

_____

[25] Courts in this Circuit have referred to this standard of review as "arbitrary and capricious" or "abuse of discretion." Both standards of review are essentially identical and the Court views, and will use these terms, as interchangeable. *See* Howley v. Mellon Fin. Corp., 625 F.3d 788, 793 n. 6 (3d Cir. 2010).

Administrator, did not make the decision regarding Plaintiff's LTD benefits eligibility.  Rather, a claims management company, Sedgwick, made the determination, and, according to Plaintiff, only decisions of the Plan Administrator are entitled to the deferential abuse of discretion standard of review.  In response, Defendant opines that the Plan vests PNC with broad discretionary authority, including the ability to delegate that authority to a third party to assist with the review and administration of benefit claims.  According to Defendant, PNC entered into an agreement that transferred its discretionary authority to Sedgwick.  Plaintiff retorts that this agreement was contrary to the provisions of the Plan.

To determine the appropriate standard of review, the Court must first examine the language of the plan and ascertain whether it gives the plan administrator discretionary authority to decide eligibility benefits or interpret terms of the plan. *See* Firestone Tire & Rubber Co., 489 U.S. at 115; *see also* Luby v. Teamsters Health, Welfare, & Pension Trust Funds, 944 F.2d 1176, 1180 (3d Cir. 1991) ("Whether a plan administrator's exercise of power is mandatory or discretionary depends on the terms of the plan"). The Plan provides:

    V. . . .

    3.  Plan Administrator.
        a.  . . . The Company [PNC] shall be the Plan

20

Administrator and the 'named fiduciary' under
ERISA.  The [Plan] Administrator shall be vested
with all the power, authority and discretion
necessary to supervise and control the operation
of the Plan. . . . Such powers include, but not by
way of limitation, the following: . . .

> (1)  To establish and enforce such rules,
> regulations and procedures as it shall deem
> necessary and proper for the efficient
> operation and administration of the Plan;
>
> (2)  To interpret the Plan, and the rules and
> regulations . . .
>
> (3)  To determine the eligibility and status
> of any Employees with respect to Plan
> participation;
>
> (4) To determine questions of fact, law and
> mixed questions of fact and law;
>
> (5)  To compute and estimate for payment the
> amount of benefit payable to any persons in
> accordance with the terms of the Plan; and
>
> (6)  To appoint or employ individuals or
> firms to assist in the administration of the
> Plan and any other agent or agents it deems
> advisable.

b.   The [Plan] Administrator shall have complete
and sole discretion with regard to each of the
powers listed . . . and no decision of the [Plan]
Administrator shall be overturned unless the
decision is arbitrary and capricious.

Plan, Doc. 30, Exhibit 3 at AR 343-44.  This provision not only

vested discretionary authority with PNC, but also identified it

as the Plan Administrator.[26]

    Even though the Plan does not specifically identify Sedgwick

or directly vest it with any discretionary authority, the Court

---

[26]  Plaintiff concedes that at all relevant times the Plan
identified PNC as the Plan Administrator, and it possessed
discretionary authority to administer the Plan.

may still review Sedgwick's decision under the abuse of
discretion standard.  Neither the Supreme Court nor the Third
Circuit has ever limited the "deferential standard of review to
[only] ERISA fiduciaries." Marx v. Meridian Bancorp, Inc., 32
Fed. Appx. 645, 650 (3d Cir. 2002); Geddes v. United Staffing
Alliance Employee Medical Plan, 469 F.3d 919, 925 (10th Cir.
2006) (noting that the Supreme Court has "declined to limit how
an ERISA plan administrator . . . may exercise its discretionary
authority").  In fact, ERISA explicitly permits a "named
fiduciary", such as the plan administrator, to delegate its
fiduciary responsibilities to a non-fiduciary. Marx, 32 Fed.
Appx. at 650 (citing 29 U.S.C. 1105(c)(1) ("The instrument under
which a plan is maintained may expressly provide for procedures .
. . for named fiduciaries to designate persons other than named
fiduciaries to carry out fiduciary responsibilities . . . under
the plan")).  In other words, "[o]nce a health plan administrator
. . . has been delegated discretionary authority under the terms
of the ERISA plan, nothing prevents that administrator from then
delegating portions of its discretionary authority to
non-fiduciary third parties." Geddes, 469 F.3d at 926; see Lee v.
MBNA Long Term Disability & Benefit Plan, 136 Fed. Appx. 734, 742
(6th Cir. 2005) ("It is well established that an ERISA fiduciary
may delegate its fiduciary responsibilities to either another
named fiduciary or a third party if the plan establishes

procedures for such delegation"). In the instances where a plan administrator delegates its discretionary authority to a third party, that third party's decision is then reviewed under the abuse of discretion standard. *See e.g.* Marx, 32 Fed. Appx. at 649-50; Geddes, 469 F.3d at 927 ("Decisions made by an independent, non-fiduciary third party at the behest of the fiduciary plan administrator are entitled to Firestone deference because the third parties act only as agents of the fiduciary").

As a prerequisite for a plan administrator to assign its fiduciary responsibilities to a third party, the plan must authorize the delegation. *See* Geddes, 469 F.3d at 926 (noting it "is especially true" that a plan administrator may delegate its discretionary authority when "such delegation is explicitly authorized by the plan document"); *see also* Marx v. Meridian Bancorp, Inc. Long Term Disability Plan, No. 99-4484, 2001 WL 706280, at * 3 (E.D.Pa. June 20, 2001), *aff'd*, 32 Fed. Appx. 645 (3d Cir. 2002) (holding that the plan document authorized the plan administrator to delegate "the review of a denial of benefits" to a third party). However, the plan need not provide the specific details of the delegation. The responsibilities and duties of the assignee may be defined in other documentation, such as an administrative services agreement or a summary of plan description. *See* Marx, 2001 WL 706280, at * 3, *aff'd*, 32 Fed. Appx. 645 (3d Cir. 2002) (relying upon the details contained

23

within the administrative services agreement to conclude that the
plan administrator granted discretionary authority to a third
party to adjudicate the disability claims for the plan); *see also*
Costantino v. Washington Post Multi-Option Benefits Plan, 404 F.
Supp.2d 31, 39-41 (D.D.C. 2005) (relying upon the details
contained within the summary of plan description to conclude that
the plan administrator granted discretionary authority to a third
party to adjudicate the disability claims for the plan).

In the present matter, Plaintiff's primary contention is
that the Plan did not permit PNC to delegate its discretionary
authority to Sedgwick.  According to Plaintiff, the Plan only
bestowed the authority upon PNC to appoint a third party to
assist with the administration of the Plan.  Although the Plan
does not specifically utilize the term "delegate," there are no
"magic words" for delegation. *See* Marx, 32 Fed. Appx. at 649
(quoting Ludy, 944 F.2d at 1180, (quoting de Nobel v. Vitro
Corp., 885 F.2d 1180, 1187 (4th Cir. 1989))) (noting that with
respect to discretionary authority, "no 'magic words' . . . need
by expressly stated in order for the plan to accord the
administrator discretion to interpret plan terms . . . so long as
the plan on its face clearly grants such discretion")).
Furthermore, a reasonable interpretation of the term 'assist'
permits delegation.  'Assist' is a very broad term.  If a plan
administrator delegates to a third party its discretionary

24

authority to adjudicate disability claims, that third party, in turn, assists the plan administrator.  Consequently, 'delegate' and 'assist' are not mutually exclusive.  The Court, therefore, concludes that the Plan, specifically Section V(3)(a)(6), permitted Defendant to delegate its discretionary authority to Sedgwick.

This interpretation of the Plan is further buttressed by the Service Agreement.  Attachment B of the Service Agreement outlined in substantial detail the responsibilities of Sedgwick. These responsibilities included, for example, "claims administration for any employee applying for LTD" and the "determination of eligibility for benefit on all LTD claims." Service Agreement with Sedgwick Claims Management Services, Inc. on behalf of The PNC Financial Services Group, Inc., Doc. 30, Exhibit 3 at AR 370.  These provisions clearly indicated a grant of discretionary authority to Sedgwick. *See* Haisley, 2011 WL 818669 at *10 (finding that the exact same language as present in the pending matter was "clear and unambiguous" and mandated the abuse of discretion standard).  Consequently, the Court will apply the abuse of discretion standard.

### D.  Abuse of Discretion Analysis

Under the abuse of discretion standard of review, "the Court's role is not to interpret ambiguous provisions *de novo*, but rather to 'analyze whether the plan administrator's

25

interpretation of the document is reasonable.'" Brunswick Surgical Ctr., L.L.C. v. Cigna Healthcare, No. 09-5857, 2010 WL 3283541, at * 14 (D.N.J. Aug. 18, 2010) (quoting Bill Gray Enters. Inc. Employee and Health Welfare Plan v. Gourley, 248 F.3d 206, 218 (3d Cir. 2001)). A decision is considered arbitrary and capricious "if it is without reason, unsupported by substantial evidence or erroneous as a matter of law." Abnathya v. Hoffman-La Roche, Inc., 2 F.3d 40, 45 (3d Cir. 1993). To determine whether a plan administrator abused its discretion, the Court must focus "on how the administrator treated the particular claimant." Miller v. Am. Airlines, Inc., 632 F.3d 837, 845 (3d Cir. 2011) (quoting Post v. Hartford Ins. Co., 501 F.3d 154, 162 (3d Cir. 2007)). "Specifically, in considering the process that the administrator used in denying benefits, we have considered numerous irregularities to determine whether . . . the administrator has given the court reason to doubt its fiduciary neutrality." Id. (internal quotations omitted). This is accomplished "by taking account of several different, often case-specific, factors, reaching a result by weighing all together." Id. (quoting Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105, 117 (2008)). The scope of our review, however, "is narrow, and the court is not free to substitute its own judgment for that of the plan administrator in determining eligibility for plan benefits." Cardiology Consultants of North Morris v. UFCW

26

<u>Local 464A Health Reimbursement Welfare Fund</u>, No. 06-5557, 2007
WL 4570160, at * 2 (D.N.J. Dec. 21, 2007).  In other words, the
plaintiff retains the burden to prove that he is entitled to
benefits, and that the plan administrator's decision was
arbitrary and capricious.

Section 502(a)(1)(B) of ERISA permits a participant to file
suit to recover benefits due under the terms of the plan. 29
U.S.C. § 1132(a)(1)(B).  Plaintiff asserts that Sedgwick's
termination of her LTD benefits was arbitrary and capricious
because Sedgwick (1) failed to comply with ERISA's notice
provisions, (2) resorted to 'cherry picking' to affirm its
decision, (3) failed to consider the decision of the SSA granting
Plaintiff disability benefits, (4) failed to consider the side
effects of Plaintiff's prescription medication and Dr.
Burnstein's diagnosis of rhupus, (5) had no reasonable basis to
conclude Plaintiff was no longer disabled, (6) required Plaintiff
to prove her disability by objective evidence and (7)
unreasonably relied on the biased opinions of Drs. Payne and
Lumpkins.  The Court will address each of Plaintiff's objections
independently and in turn.

### 1.  Compliance with ERISA's Notice Requirements

Section 503(1) of ERISA requires, in pertinent part, that a
plan administrator, upon denying a benefits claim, must furnish

the claimant with "adequate notice in writing . . . setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant." 29 U.S.C. § 1133(1).[27]  Administrative regulations promulgated in furtherance of § 503(1) provide additional clarification as to what constitutes adequate notice.  These regulations state that the plan administrator shall furnish the claimant with a "description of any additional material or information necessary to perfect the claim and an explanation of why such material or information is necessary." 29 C.F.R. § 2560.503-1(g)(1)(iii).  In <u>Miller</u>, the Third Circuit recently opined that § 2560.503-1(g)(1)(iii) requires that the termination letter provide the "precise information necessary to advise" a plaintiff "how to perfect his claim." <u>Miller</u>, 632 F.3d at 852.  In other words, the denial letter must detail how the claimant "could achieve a favorable disability determination." <u>Id.</u>

Presently, Plaintiff alleges that Sedgwick's termination letter failed to properly advise her on what precise information she must provide to prove her claim.  In response, Defendant contends Sedgwick complied with ERISA's notice requirements.  The Court disagrees.  Sedgwick's October 24, 2008 denial letter does

---

[27]   In <u>Miller</u>, the Third Circuit determined that even though a plaintiff initiated suit under § 502, "an administrator's compliance with § 503 in making an adverse benefit determination is probative of whether the decision to deny benefits was arbitrary and capricious." <u>Miller</u>, 632 F.3d at 852.

not satisfy the requirements of 29 C.F.R. §
2560.503-1(g)(1)(iii). Not only does the letter fail to
specifically advise Plaintiff how she may perfect her claim, but
it also neglects to adequately explain why such information is
necessary.

Sedgwick's denial letter informed Plaintiff that her
"medical information . . . does not contain sufficient findings
subjectively or objectively that would support total disability"
from her occupation. Doc. 30, Exhibit 2, AR 137. Although this
statement implies that the information Plaintiff provided was
insufficient to establish her disability, it does not explain
what evidence she must submit to prove her disability or express
why this additional information is necessary. *See* DellaValle v.
The Prudential Ins. Co. of Am., No. 05-273, 2006 WL 83449, at * 8
(E.D.Pa. Jan. 10, 2006) (finding that the general statement that
medical information in the file does not establish disability
does not comply with 29 C.F.R. § 2560.503-1(g)(1)(iii)).
Furthermore, the information Sedgwick provided was not "precise."
At best, it required Plaintiff to "read between the lines" and
discern, without any guidance, the quantity, type or detail of
the information she must provide Sedgwick.

Compliance with the requirements of § 2560.503-1(g)(1)(iii)
is even more critical because of the unique facts of this case.
Sedgwick terminated Plaintiff's LTD benefits because her "medical

information . . . does not contain sufficient findings subjectively or objectively that would support total disability" from her occupation. Doc. 30, Exhibit 2 at AR 137.  Although the reasonable inference from the aforementioned statement is that Plaintiff must provide further objective evidence of disability, the specific facts of this case render it difficult for her to determine how to proceed to perfect her claim.  In support of her initial LTD benefits claim, Plaintiff submitted medical documentation from Dr. Burnstein.  This documentation included both objective and subjective evidence of Plaintiff's disability.[28]  After receiving this information, on March 15, 2007, Sedgwick approved Plaintiff's LTD benefits claim.  Several months later, on November 21, 2007, Sedgwick suspended Plaintiff's claim because she failed to provide further evidence of her disability.[29]  In response, Plaintiff submitted medical records from five office visits with Dr. Burnstein.  These records also contained both objective and subjective evidence of

---

[28]  With respect to objective evidence, Dr. Burnstein specifically noted that laboratory studies revealed that Plaintiff's double-stranded DNA was "mildly" elevated and her ANA was "positive." Doc. 30, Exhibit 4 at 314.  These objective findings are indicative of lupus.  Also included within the documentation were Plaintiff's subjective complaints of joint pain, swelling, weakness and fatigue.

[29]  Under the terms of the Plan, Plaintiff had an ongoing obligation to provide evidence of her disability.

her disability.[30]  Significantly, the medical evidence provided, in response to Sedgwick's November 21, 2007 letter, was essentially identical to the medical evidence initially given to Sedgwick in support of Plaintiff's disability claim.[31]  Upon Sedgwick's receipt of these records, it reviewed them and, subsequently, informed Plaintiff that it would reinstate her LTD benefits.  Approximately one year later, in July, August and September 2008, Sedgwick again requested that Plaintiff provide additional medical information documenting her disability.  In response, Dr. Burnstein provided a report and documentation from an office visit that contained essentially the same objective and subjective evidence of Plaintiff's disability that he provided Sedgwick in response to its November 21, 2007 letter.[32]  After an independent review of the evidence, Sedgwick terminated Plaintiff's LTD benefits.

Without further guidance, it was impossible for Plaintiff to know exactly what type of objective evidence Sedgwick required

---

[30]  Dr. Burnstein specifically noted Plaintiff's subjective complaints of fatigue, headaches, and morning stiffness, and his objective findings of swelling and tenderness in the joints of her hands and feet.

[31]  The only distinction is that the records from the five subsequent office visits did not contain any indication of whether any recent laboratory studies were conducted.

[32]  With respect to objective findings, Dr. Burnstein indicated Plaintiff had tender hand joints.  His subjective notations included Plaintiff's complaints of morning stiffness, fatigue and of more frequent infections.

her to submit so she could perfect her claim.  As the above-mentioned facts indicate, Sedgwick initially accepted Plaintiff's evidence of her disability.  Then, approximately one year later, it found essentially the same evidence insufficient.  Such a decision, without giving any specific indication of what objective evidence Plaintiff must provide, violates § 2560.503-1(g)(iii) because it makes it difficult, if not impossible, for Plaintiff to understand or challenge Sedgwick's termination decision.  Plaintiff is left at a loss to comprehend why essentially the same evidence that was originally sufficient to support her claim was now deficient.  Without any type of guidance or explanation, Plaintiff could not have possibly ascertained what constituted acceptable evidence.[33]  Under these

_____

[33]  Defendant further postulates that even if the denial letter was deficient, Sedgwick complied with ERISA's notice requirements because, on December 10, 2008, it mailed Plaintiff's counsel a letter detailing the types of medical documentation that would be necessary for Plaintiff to submit to perfect her claim.  According to Sedgwick, this documentation included "medical records - such as office visits, test results, lab work, diagnostic studies, x-rays, MRI's, blood work, etc." which had not "been provided during the [initial] claim review."  Doc. 30, Exhibit 2 at AR 152.  Although this type of information detailed in the December 10, 2008 letter would generally be sufficient to comply with § 2560.503-1(g)(1)(iii), see Kao v. Aetna Life Insurance Co., 647 F. Supp.2d 397, 411 - 12 (D.N.J. 2009) (holding that a denial letter that told a plaintiff she needed to provide quantitative data and clinical evidence in support of her appeal was sufficient to comply with the notice requirements), the Court finds it insufficient in this case.  As discussed in the preceding paragraphs, Sedgwick's decision to credit and then subsequently discredit Plaintiff's medical evidence required them to, in greater detail, explain what evidence Plaintiff must provide to perfect her claim.  The December 10, 2008 letter is

circumstances, where the plan administrator in essence reverses its own decision on identical evidence it previously considered sufficient, it must provide Plaintiff with more detailed information indicating what specifically she must supply to prove her claim.  The Court, therefore, concludes Sedgwick failed to satisfy the notice requirements of ERISA and comply with 29 C.F.R. § 2560.503-1(g)(iii).[34]  Sedgwick's failure to provide the precise information necessary on how Plaintiff could achieve a favorable result weighs in favor of finding that its decision to terminate her LTD benefits was arbitrary and capricious.

### 2.  Analysis of All Relevant Diagnoses, including RHUPUS and medication[35]

"An administrator's failure to address all relevant diagnoses in terminating a claimant's benefits . . . suggests the

---

not helpful in that endeavor because it does not provide sufficient guidance to alert Plaintiff as to the precise information she must provide.

[34]  Although Defendant states that failure to comply with § 2560.503-1(g)(iii) requires remand, the Third Circuit has specifically concluded that a plan administrator's failure to comply with § 2560.503-1(g)(iii) "in making an adverse benefit determination is probative of whether the decision to deny benefits was arbitrary and capricious." Miller, 632 F.3d at 851. Consequently, the Court will not remand this matter on that basis alone.

[35]  The Court combines Plaintiff's second and fifth argument because they are essentially identical.  In Plaintiff's second point she argues that Sedgwick failed to consider the side effects of her medication, and, in her fifth point, argues that Sedgwick failed to consider the side effects of her medication and ignored Dr. Burnstein's diagnosis of rhupus.

decision may have been arbitrary and capricious." Miller, 632 F.3d at 853. "It follows that if a reviewing court errs by failing to address a plaintiff's multiple conditions, the court should give little deference to a plan administrator's decision which also fails to take multiple conditions into account." Kosiba v. Merck & Co., No. 98-357, 2011 WL 843927, at * 13 (March 7, 2011).

In the present matter, Sedgwick's termination letters did not include any reference to why it discredited Dr. Burnstein's rhupus diagnosis.  Therefore, the Court must examine whether the independent medical physicians' reports sufficiently scrutinized the diagnosis. See Miller, 632 F.3d at 853.  After review of Drs. Payne and Lumpkins' reports, the Court concludes Sedgwick failed to adequately address Plaintiff's rhupus diagnosis.

With respect to Dr. Payne's report, he noted that Plaintiff had no objective signs of systemic lupus other than a positive ANA.  In his review of her medical records, he noted the absence of any evidence of weakness, atrophy or synovitis and joint damages or destruction.  Based upon these findings, he concluded Plaintiff's symptoms were "not consistent with a connective tissue process." Doc. 30, Exhibit 2 at AR 128-29.  Notably absent from his findings, however, was any discussion of whether Plaintiff suffered from rhupus.

Albeit more comprehensive than Dr. Payne's report, Dr.

34

Lumpkins's report was equally deficient.  Although she mentioned
Dr. Burnstein's rhupus diagnosis, she did not explain or
elaborate upon it or his findings.  Her only references to rhupus
were in the context of describing the contents of Dr. Burnstein's
medical records and diagnoses. *See* Miller 632 F.3d at 855
(holding that a mere reference to a diagnosis without further
explanation "casts doubt on the reasonableness" of the plan
administrator's decision); *see also* Lamanna v. Special Agents
Mut. Benefits Ass'n, 546 F. Supp 2d. 261, 294 (W.D.Pa. 2008) ("We
cannot agree that [independent medical file reviewers] simply
summarizing another physician's findings is the same as
'specifically discussing' why they disagree").  Even though Dr.
Lumpkins acknowledged that Plaintiff's "medical record supports
that she has serologies consistent with the diagnosis of systemic
lupus erythematosus or the positive ANA, a positive double-
stranded DNA, and a positive IgM anticardiolipin antibody," Doc.
30, Exhibit 3 at AR 201, she concluded that "[t]he medical
records fail to substantiate the severity of either systmeic
lupus erythematosus or rheumatoid arthritis." Doc. 30, Exhibit 2
at AR. 200.  To reach this conclusion, Dr. Lumpkins relied upon
the lack of objective medical evidence indicating the severity of
Plaintiff's disability. *See* Id. (noting that Plaintiff's file
contains a lack of "radiographic findings or imaging studies that
support that the claimant has significant range of motion

35

restrictions or any significant musculosketeal deficits" and the file also "fails to demonstrate significant internal organ involvement" that would preclude Plaintiff from working as a Branch Manager III).

Notably, Dr. Lumpkins's conclusions were specifically limited to the lupus and rheumatoid arthritis portions of Dr. Burnstein's diagnosis.  In other words, she analyzed whether the medical evidence indicated that Plaintiff was disabled because of lupus or rheumatoid arthritis, not some combination of the two. Dr. Burnstein's diagnosis, however, was that Plaintiff suffered from rhupus, mild cases of both lupus and rheumatoid arthritis, and it was the combination of these two diseases which caused the severity of Plaintiff's disability.  Dr. Lumpkins's analysis was deficient because she failed to consider whether the combined effect of lupus and rheumatoid arthritis was severe enough to prevent Plaintiff from employment as branch manager III. Instead, Dr. Lumpkins only addressed each disease separately and independently.  A line in her report glaringly highlights this error.  When demonstrating why the medical records failed to substantiate Plaintiff's disability, Dr. Lumpkins utilized the term "or" to indicate that Plaintiff's "systemic lupus erythematosus **or** rheumatoid arthritis" (emphasis added) was not sufficiently severe as to restrict her from working. Id. Consequently, Sedgwick's failure to address the rhupus diagnosis

36

in its termination letters, and the failure of Drs. Payne and
Lumpkins to discuss it in their reports, provide evidence that
Sedgwick did not fully consider all of Plaintiff's diagnoses.
The Court will, therefore, weigh this factor in favor of
concluding that Sedgwick's decision to deny Plaintiff LTD
benefits was arbitrary and capricious.[36]

### (3) Consideration of the SSA's Decision Awarding Plaintiff Disability Benefits

An award of social security disability (hereinafter "SSD")
benefits by the SSA "may be considered as a factor in evaluating
whether a plan administrator has acted arbitrarily and
capriciously in reviewing a plaintiff's claim." Marciniak v.
Prudential Fin. Ins. Co. of Am., 184 Fed. Appx. 266, 269 (3d Cir.
2006).  It is well established, however, that an award of SSD
benefits does not in itself establish "that an administrator's
decision was arbitrary and capricious." Kosiba, 2011 WL 843927,
at * 17.  "The legal principles controlling the Social Security
analysis differ from those governing the ERISA analysis, and,

---

[36]  Sedgwick did not need to specifically address whether
Plaintiff was disabled due to the side effects of her
medications.  First, Dr. Burnstein's medical records did not note
any significant lasting side effects from the medication.
Second, despite Plaintiff's contention that she provided Sedgwick
with information about her side effects, the information
submitted was insufficient to require a response.  Plaintiff only
submitted a list of medications and a typed document indicting
what side effects she experienced.  Sedgwick's decision not to
credit these types of complaints was not arbitrary and
capricious.

thus, the SSA's determination of disability is not binding on an ERISA benefit plan." Id.; see Pokol v. E.I. Du Pont De Nemours & Co., Inc., 963 F.Supp. 1361, 1380 (D.N.J. 1997) ("[I]t is not inherently contradictory to permit an individual to recover benefits pursuant to the Social Security Act while being denied benefits pursuant to a private ERISA benefit plan").

Even though a plan administrator is not required to adhere to an award of SSD benefits, it is also not free to entirely ignore the SSA's determination of benefits.  "[I]f the plan administrator (1) encourages the applicant to apply for SSD payments; (2) financially benefits from the applicant's receipt of Social Security; and then (3) fails to explain why it is taking a position different from the SSA on the question of disability, the reviewing court should weigh this in favor of a finding that the decision was arbitrary and capricious." Kosiba, 2011 WL 843927 at * 18 (quoting Curry v. Eaton Corp., 400 Fed. Appx. 51, 68 (6th Cir. 2010) (quoting Bennett v. Kemper Nat'l Servs., Inc., 514 F.3d 547, 553 (6th Cir.2008))); see Glenn, 544 U.S. at 118 (remarking that the plan administrator's failure to address the SSA's award of benefits "suggested procedural unreasonableness" when the plan administrator encouraged the claimant to seek SSD benefits).

In the present matter, as a condition of her continued receipt of LTD benefits, Sedgwick required Plaintiff to apply for

SSD payments.[37] *See* <u>Haisley</u>, 2011 WL 818669 at *15 (holding that it was unreasonable for defendants to ignore an award of SSD benefits when it required the plaintiff to apply for benefits). On April 7, 2008, Plaintiff's SSD claim was approved for $1865.00 per month. Doc. 30, Exhibit 3 at AR 235 & AR 237.  Consequently, under the terms of the Plan, this award financially benefitted Sedgwick because Plaintiff's LTD benefits were offset by any payment she received from the SSA.  Prior to this decision granting benefits, Plaintiff received $4141.67 per month from Sedgwick. <u>Id.</u> at AR 237 & AR 277.  After SSD benefits were approved, Sedgwick was only responsible to pay Plaintiff $2276.67 per month. <u>Id.</u> at AR 237.

With respect to the third factor, the Court reiterates that Sedgwick need not adhere to the decision of the SSA, it must only explain why it did not follow the administration's decision. However, neither Sedgwick's denial letters nor anywhere in the administrative record, did it review, consider or address the SSA's decision.  In Sedgwick's defense, Defendant argues that Sedgwick reviewed Plaintiff's entire administrative file, which included the decision by the SSA.  This contention is

---

[37]  On May 1, 2007, the SSA initially informed Plaintiff that she was ineligible to receive disability payments.  The record reveals that after her claim was denied, Sedgwick contracted with Allsup, a social security disability insurance representation service, to assist Plaintiff with securing SSD benefits. Doc. 30, Exhibit 3 at AR 235, AR 275 and AR 276.

insufficient.[38]   Sedgwick, in its denial letter, needed to
address the SSA's decision and explain why it chose not to credit
the decision. *See* Kao 647 F. Supp.2d at 420 (noting that the plan
administrator did not ignore the award of SSD benefits because it
recited correspondence with the SSA in its termination letter as
one of the documents it considered in resolving the appeal); *see
also* Funk v. Cigna Group Ins., No. 08-5208, 2010 WL 3522085, at *
3 n.8 (D.N.J. Aug. 31, 2010) (concluding that a plan
administrator's failure to reconcile an award of SSD benefits
with its determination that the plaintiff was not disabled was a
factor which indicated the plan administrator's decision was
arbitrary and capricious, especially because the plan
administrator assisted the plaintiff in filing for benefits).
The Court, therefore, concludes that Sedgwick's failure to
address the decision of the SSA granting Plaintiff SSD benefits
weighs in favor of finding that its decision to terminate her LTD

---

[38]   Defendants rely upon Stith v. Prudential Ins. Co. of Am.,
356 F. Supp.2d 431, 440 n.4 (D.N.J. 2005) in support of their
assertion that the plan administrator need not specifically refer
to the SSA's decision.  Defendant's reliance on this case is
misplaced for two reasons.  First, unlike in the present matter,
the Court's opinion in Stith does specifically indicate whether
the plan administrator required Defendant to obtain SSD benefits
or whether it would benefit from an award of SSD.  Second, the
holding of Stith is undermined by the Supreme Court's decision in
Glenn, which indicated that the plan administrator's failure to
address the SSA's award of benefits "suggested procedural
unreasonableness" when the plan administrator encouraged the
claimant to seek social security disability benefits. Glenn, 544
U.S. at 118.

benefits was arbitrary and capricious.

### 4. Reasonable Basis to Conclude Whether Plaintiff was no Longer Disabled

The Third Circuit has held that "[a]n administrator's reversal of its decision to award a claimant benefits without receiving any new medical information to support this change in position is an irregularity that counsels towards finding an abuse of discretion." Miller, 632 F.3d at 848; see Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377, 393 (3d Cir. 2000), overruled on other grounds by Glenn, 544 U.S. 105 (2008) (noting that "[i]nconsistent treatment" of "the same facts" should be viewed with "suspicion"). This ruling, of course, does not prohibit a plan administrator from ever terminating benefits. Miller, 632 F.3d at 849. Rather, it requires that any decision to terminate benefits be based on additional medical evidence not originally reviewed. See Hoch v. Hartford Life & Acc. Ins. Co., No. 08-4805, 2009 WL 1162823, at * 17 (E.D.Pa. Apr. 29, 2009) (finding that the plan administrator's decision to terminate benefits was not arbitrary and capricious when the reversal occurred after "the test changed from own-occupation to any-occupation"). In determining whether benefits were improperly terminated, courts must "focus on the events that occurred between the conclusion that benefits were owing [sic] and the decision to terminate them." McOsker v. Paul Revere Life

41

Ins. Co., 279 F.3d 586, 590 (8th Cir. 2002).

In a letter dated March 15, 2007, Sedgwick informed
Plaintiff that her application for LTD benefits was approved
because "[m]edical information indicates" that, as a result of
lupus, she cannot continue her employment. Doc. 30, Exhibit 3 at
AR 277.  At this time, Plaintiff was also told that her continued
receipt of benefits was conditioned on her ongoing ability to
meet the Plan's definition of "Total Disability" and that "[o]n a
periodic basis" Sedgwick would request "information from you and
your attending physicians" to "verify your ongoing eligibility
for benefits." Id. at 278.  On November 21, 2007, Sedgwick
informed Plaintiff that it "formally suspended" her claim due to
"a lack of current treatment information on file supportive of
continuing total disability." Id. at 243.  In response, Plaintiff
submitted medical records from Dr. Burnstein that were
substantially similar to the evidence she submitted in support of
her initial claim.  After receipt of this documentation Sedgwick
reinstated her benefits.

Several months later, in July and August 2008, in
preparation for the change of Plaintiff's LTD eligibility from
"regular occupation" to the more broad "any occupation", Sedgwick
again requested additional medical information from Plaintiff
documenting her disability.  Dr. Burnstein again submitted
medical documentation that was essentially identical to the

42

evidence submitted in response to Sedgwick's November 21, 2007 inquiry.  Apparently unsatisfied that the evidence it received sufficiently supported her continued disability, Sedgwick, on October 24, 2008, concluded Plaintiff was no longer "eligible for continued LTD benefits." Doc. 30, Exhibit 2 at AR 135.

Plaintiff claims Sedgwick, without receipt of any new medical evidence, arbitrarily and capriciously reversed its prior decision awarding her benefits.  This contention is correct.[39] The records Sedgwick received in response to their July, August and September 2008 letters did not differ in any material aspect from either (1) the records Dr. Burnstein submitted in response to Sedgwick's November 21, 2007 inquiry or (2) the records he submitted in March 2007 that supported Sedgwick's initial disability determination.  Each report mirrored the next with

---

[39]  In its brief for summary judgment Defendant essentially proves Plaintiff's argument.  For several pages Defendant highlights the similarity among Dr. Burnstein's submissions to Sedgwick.  Although Defendant's point is that Dr. Burnstein's medical records did not substantiate a finding that Plaintiff was disabled, in making this argument, Defendant all but concedes the inconsistency of Sedgwick's treatment of Dr. Burnstein's records. In essence, Defendant argues that all of Dr. Burnstein's submissions were similar and that he never provided any objective medical evidence of Plaintiff's disability.  This dissimilar treatment of essentially identical evidence was precisely the type of conduct that the Third Circuit, in Miller, found to be arbitrary and capricious. See Miller, 632 F.3d at 849 (holding that "in the absence of any meaningful evidence to support a change in position," a plan administrator's "abrupt reversal" of a prior award of benefits is arbitrary and capricious when the plan administrator justifies its reversal on the same type of medical evidence which it intially used as justification for an award of benefits).

respect to the details of Plaintiff's objective and subjective symptoms of rhupus.  For example, the information submitted in response to the November 21, 2007 inquiry contained Dr. Burnstein's objective findings of swelling and tenderness in the joints of Plaintiff's hands and feet and detailed her subjective complaints of headaches, dizziness and morning stiffness.  Later, in response to the July, August and September 2008 requests, Dr. Burnstein submitted essentially the same information that was already on the record: his objective findings of tender hand joints and Plaintiff's subjective complaints of morning stiffness and fatigue.  Dr. Burnstein additionally included his conclusions about the severity of Plaintiff's condition, which echoed the evidence submitted in support of Plaintiff's initial application for LTD: disabled because Plaintiff cannot sit or stand for more than 1-2 hours a day, has restricted motions in her joints and has difficulty grasping and with finger manipulation.

As a result, the information Sedgwick relied on to terminate Plaintiff's LTD benefits was the same type of documentation it utilized to support a disability finding in March 2007 and again in December 2007 as justification of the reinstatement of her benefits.  Consequently, because Dr. Burnstein's records did not differ in any material aspect, his subsequent submissions did not provide Sedgwick with any new medical information.  The records were "only 'new' to the extent that they had not been received

44

before," Miller, 632 F.3d at 849, and contained more recent, albeit essentially identical to the prior submissions, evidence of Plaintiff's disability. *See* Haisley, 2011 WL 818669, at * 13 (concluding that "Sedgwick retroactively determined that an award of LTD benefits was not warranted in the first place" was "inconsistent treatment of the same medical information" and a factor that its decision to deny benefits was arbitrary and capricious). With respect to actual evidence, the records failed to provide new information.

Neither can Defendant claim that the reports of Drs. Payne and Lumpkins constituted new medical information. These reports were not new information because neither doctor physically examined Plaintiff, conducted any tests on her or even spoke with Dr. Burnstein about her condition. Rather, to reach their conclusions that Plaintiff was not disabled, both physicians merely reviewed the medical files of Dr. Burnstein and Plaintiff's submissions.[40]  After their review of this evidence, Drs. Payne and Lumpkins concluded Plaintiff was not sufficiently disabled so as to preclude her from working as a branch manager III. This new conclusion, however, is not new medical evidence. The only new aspect of their reports was their interpretation of previously considered evidence. A second and different

---

[40]  The Court concluded in the aforementioned paragraph that these materials were not in and of themselves new medical evidence.

interpretation of evidence does not constitute new medical evidence – a new opinion by a new physician does not create new medical evidence when the physician based his conclusion solely upon previously considered evidence.  Therefore, the Court concludes that Sedgwick's abrupt reversal of its prior decision awarding benefits weighs heavily in favor of finding that its termination decision was arbitrary and capricious.

### (5) Reliance on Non-Existent Plan Requirements – Objective Evidence

Plaintiff opines that Sedgwick improperly dismissed her LTD claim on the basis that she did not provide any objective evidence of the severity of her disability.  According to Plaintiff, Sedgwick's actions were improper because the Plan does not require her to prove her disability or its severity with objective evidence.  Courts in this district, however, have held that "[b]ecause a reasonable person could find . . . objective evidence helpful in establishing a standard measurement of the extent or severity of a claimant's symptoms and disability . . . requiring such evidence was not arbitrary and capricious." Kao, 647 F. Supp.2d at 413 (quoting Sarlo v. Broadspire Servs., Inc., 439 F. Supp.2d 345, 362 (D.N.J. 2006) (citing Nichols v. Verizon Commc'ns Inc., 78 Fed. Appx. 209, 212 (3d Cir. 2003))).  The Court is in agreement, and Plaintiff has not cited any case law to the contrary.  Therefore, Sedgwick's decision to require

objective evidence as proof of Plaintiff's disability and its severity was not unreasonable.  The Court will weigh this factor in favor of upholding Sedgwick's determination.

### (6) Reliance on the Opinions of Drs. Payne and Lumpkins

Plaintiff contends Sedgwick unreasonably relied upon the biased opinions of Drs. Payne and Lumpkins to deny her LTD claim. According to Plaintiff, a conflict of interest existed between Sedgwick and Drs. Payne and Lumpkins because they received payment for their consulting services.  Although Sedgwick did not directly pay the physicians, Plaintiff postulates that Drs. Payne and Lumpkins both possessed a financial incentive to deny her LTD claim because they were "more likely to generate more referrals," Pl. Oppn. Br. 5, from Network Medical Review, the independent company Sedgwick contracted, if they denied Plaintiff's claim. In support of this assertion, Plaintiff states that from January 1, 2005 to October 7, 2008, Dr. Payne denied four out of five claims, or 20% of all claims he reviewed, and from January 1, 2005 to February 10, 2009, Dr. Lumpkins denied three out of eleven claims, or 27.7% of all claims she reviewed.

In support of this argument, Plaintiff relies upon Scotti v. Prudential Welfare Benefits Plan, No. 08-3339, 2009 WL 2243959, at * 3 (D.N.J. July 23, 2009).  In Scotti, the district court acknowledged "[t]he mere fact that Defendants paid" independent

medical consultants "for their medical expertise does not alone render their professional determinations irrational or without substantial evidentiary basis." Scotti v. Prudential Welfare Benefits Plan, No. 08-3339, 2009 WL 2243959, at * 3 (D.N.J. July 23, 2009). The court, however, then concluded that the medical consultants "were not entirely disinterested arbiters" because they knew "that their client stood to gain by disputing Plaintiff's asserted medical condition." Id.

The Scotti decision on this point appears to turn on a lingering concern on the facts of that case of a conflict of interest in the decision making process despite certain structural safeguards. We do not discern any similar structural bias in this case, nor has Plaintiff argued that one exists.[41] We do not assume that merely because a doctor is paid by the insurance company, he will cast aside his oath to the medical profession, disregard a plaintiff's medical evidence and render judgment in favor of the insurance company because of a financial incentive. Without any evidence to suggest the aforementioned behavior occurred, we do not believe such an presumption by the court is warranted.

Here, despite her assertions to the contrary, Plaintiff

---

[41] Of course, we recognize our obligation to consider conflicts of interest in applying the abuse of discretion standard. Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 128 S.Ct. 2342, 2348 (2008).

48

failed to provide any evidence that Drs. Payne and Lumpkins were biased or that they received more referrals from PNC or Network Medical Review as a result of their decisions.[42] *See* <u>Semien v. Life Ins. Co. of N. Am.</u>, 436 F.3d 805, 814 (7th Cir. 2006) ("The fact that a plan administrator has compensated physicians for their consulting services is not, in and of itself, sufficient to establish a conflict of interest . . . . Although a plan administrator's self interest may be a "factor" to "weigh" in evaluating plan determinations, there is no reason to assume independent consultants are not impartial when evaluating medical records").

Furthermore, as another court in this district noted, "it would be reasonable to assume that most, if not all, medical consults and reviewers used by ERISA plan administers . . . are paid for their services." <u>Zurawel v. Long Term Disability Income Plan for Choices Eligible Employees of Johnson & Johnson</u>, No. 07-5973, 2010 WL 3862543, at * 12 (Sept. 27, 2010) (noting that it

---

[42] Plaintiff opines that the low denial rates of Drs. Payne and Lumpkins indicate their bias. We, however, do not find this argument persuasive. Their rate of finding that a claimant is not disabled is not evidence of whether Plaintiff's claim would be denied. Each claim the physicians review involves different plaintiffs, issues, facts and evidence. Whether the physicians concluded on past claims that the plaintiff was not disabled has no baring on what they will conclude with respect to Plaintiff. To the extent Drs. Payne and Lumpkins denial rates are indicative of a pattern of denial, the Court finds Plaintiff failed to provide sufficient evidence to establish any type of pattern.

could not find a "single case within the Third Circuit holding
that a paid consultant gives rise to an inference of
impropriety"). For the Court to find a conflict of interest or
bias, Plaintiff must prove that the reviewers acted with "*actual
impropriety.*" Id. Consequently, the mere fact that an
independent medical consultant received money is insufficient to
cast doubt on their determinations and raise an inference of
conflict, bias or impropriety. Id. The Court, therefore,
concludes that the opinions of Drs. Payne and Lumpkins were not
biased and it was entirely reasonable for Sedgwick to rely upon
their determinations.[43] We will weigh this factor in favor of
upholding Sedgwick's determination.

### E. Weighing of Factors

"To decide whether an administrator's termination of
benefits is arbitrary and capricious, we 'determine lawfulness by

---

[43] Plaintiff also asserts that it was unreasonable for
Sedgwick to accept Drs. Payne and Lumpkins' opinions over the
conclusions of Dr. Burnstein and the SSA. This argument is
without merit. It is well established that a plan administrator
need not defer to the opinions of a plaintiff's treating
physician or the findings of the SSA. *See* Black & Decker
Disability Plan v. Nord, 538 U.S. 822, 834 (2003) ("But, we hold,
courts have no warrant to require administrators automatically to
accord special weight to the opinions of a claimant's physician;
nor may courts impose on plan administrators a discrete burden of
explanation when they credit reliable evidence that conflicts
with a treating physician's evaluation"); *see also* Marciniak, 184
Fed. Appx. at 269 ("However, a Social Security award does not in
itself indicate that an administrator's decision was arbitrary
and capricious, and a plan administrator is not bound by the SSA
decision").

taking account of several different, often case-specific,
factors, reaching a result by weighing all together.'" Miller,
632 F.3d at 855 (quoting in part Glenn, 544 U.S. at 117).
Presently, the Court gives significant weight to its conclusion
that Sedgwick reversed its initial decision that Plaintiff was
disabled and terminated her benefits without receiving any
additional medical evidence that differed from the evidence it
previously considered. See Id. at 856 (giving this factor
"significant weight").  Also significant was Sedgwick's failure
to address Plaintiff's rhupus diagnosis and the decision of the
SSA awarding Plaintiff SSD benefits. See Kosiba, 2011 WL 843927,
at * 20 (giving significant weight to the plan administrator's
failure to address the plaintiff's diagnosis).  The Court finds
equally troubling Sedgwick's failure to comply with ERISA's
notice requirements under § 503. See Miller, 632 F.3d at 856
(finding the plan administrator's noncompliance with ERISA's
notice requirements as "troubling").  Finally, Sedgwick's
reliance on the opinions of Drs. Payne and Lumpkins and its
requirement that Plaintiff provide objective evidence weigh in
favor of upholding Sedgwick's determination to terminate her LTD
benefits.

Viewing these factors in their totality, however, the Court
concludes Sedgwick's decision to deny benefits "was not the
product of reasoned decision-making and substantial evidence."

51

Id.  Rather, the irregularities and errors gives the Court

"reason to doubt [Sedgwick's] fiduciary neutrality." Id. (quoting

Post, 501 F.3d at 165).  The Court, therefore, concludes

Sedgwick's improper termination of Plaintiff's benefits was an

abuse of discretion.[44]

**F.  Remedy**

Prior to the Third Circuit's decision in Miller, the remedy

for an improper termination of LTD benefits claim under §

502(a)(1)(B) was unclear.  Kosiba, 2011 WL 843927 at * 21.  In

Miller, however, the Court opined that:

> retroactive reinstatement of a claimant's benefits is
> the proper remedy when the administrator's termination
> decision was unreasonable.  In deciding whether to
> remand to the plan administrator or reinstate benefits,
> we note that it is important to consider the status quo
> prior to the unlawful denial or termination.  As such,
> an important distinction emerges between an initial
> denial of benefits and a termination of benefits after
> they were already awarded.  In a situation where
> benefits are improperly denied at the outset, it is
> appropriate to remand to the administrator for full
> consideration of whether the claimant is disabled.  To
> restore the status quo, the claimant would be entitled
> to have the plan administrator reevaluate the case
> using reasonable discretion.  In the termination
> context, however, a finding that a decision was
> arbitrary and capricious means that the administrator
> terminated the claimant's benefits unlawfully.
> Accordingly, benefits should be reinstated to restore

---

[44]  The Court notes that its conclusion that Plaintiff's LTD
benefits were improperly terminated is limited to the Plan's
"regular occupation" requirement.  The Court does not address nor
is this Opinion intended to limit Sedgwick's ability to determine
whether Plaintiff can prove she is disabled under the Plan's "any
occupation" requirement.

the status quo.

Miller, 632 F.3d at 856 (internal citations removed).  Here,
Sedgwick approved Plaintiff's LTD claim on March 15, 2007.
Approximately a year and half later, it determined Plaintiff was
no longer eligible for payments.  As discussed above, based upon
the totality of the facts, we concluded Sedgwick improperly
terminated Plaintiff's LTD benefits.  Since Plaintiff's benefits
were unlawfully terminated, in order to return her to the status
quo, the Court must retroactively reinstate her benefits from the
date of her October 1, 2008 denial to January 8, 2009.

It would be inappropriate for the Court to retroactively
reinstate Plaintiff's LTD benefits post January 8, 2009 because
there is no evidence in the administrator record, nor has the
plan administrator ever considered, whether Plaintiff's
disability will preclude her from employment in a "gainful
occupation for which . . . she is reasonable fitted by training,
education or experience."  Therefore, the Court will remand this
issue to the Plan Administrator for a determination of whether
Plaintiff is entitled to LTD benefits with respect to the period
postdating January 8, 2009.

## IV. DEFENDANT'S MOTIONS TO SEAL

In addition to its Cross-Motion for Summary Judgment,
Defendant also filed two motions to seal [Docs. 31 & 34].

Defendant's first Motion seeks to Seal its memorandum in support of its Cross-Motion for Summary Judgment [Doc. 28], its Statement of Undisputed Material Facts in Support of its Motion [Doc. 29] and the administrative record, Exhibit A [Doc. 30].  Defendant's second Motion seeks to Seal its memorandum in Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment [Doc. 35] and its Reply to Plaintiff's Response to Defendant's Statement of Undisputed Material Facts [Doc. 36].[45]

Defendant contends that the aforementioned documents contain confidential information, including (1) Plaintiff's personal and confidential medical information, (2) Plaintiff's confidential financial information, (3) confidential information concerning the Plan and the administration of LTD benefit claims under it, (4) confidential information concerning the relationship between PNC and Sedgwick and (5) confidential and proprietary business information concerning Sedgwick's process for administering LTD claims.

Local Rule 5.3(c) provides that in order to place a docket entry under seal, the motion to seal must be publicly filed and "shall describe (a) the nature of the materials or proceedings at issue, (b) the legitimate private or public interests which

---

[45]   The Court briefly pauses to note that Plaintiff's Motion for Summary Judgment and its supporting documentation was not filed under seal.  These materials included some of the very same items Defendant now attempts to seal.

warrant the relief sought, (c) the clearly defined and serious injury that would result if the relief sought is not granted, and (d) why a less restrictive alternative to the relief sought is not available." L. Civ. R. 5.3(c).

After review of the documents Defendant seeks to seal, the Court concludes a less restrictive alternative is available - Defendant can file unsealed redacted copies.  Therefore, Defendant shall, within 14 days of the Order accompanying this Opinion, file on the docket publicly accessible redacted versions of all materials it desires sealed.  With respect to the redactions, Defendant shall not redact any of Plaintiff's medical records, financial information or specific documentation Sedgwick utilized or relied upon to conclude Plaintiff was not disabled.[46] If, within the prescribed time, Defendant fails to file on the docket redacted copies of all materials it desires to seal, the Court will unseal the documents that do not have a corresponding redacted version.

---

[46] This information need not be redacted because Plaintiff, in her briefing, never filed her motions under seal or attempted to seal her own personal information.  Moreover, in her opposition to Defendant's request to seal, Plaintiff acknowledged that "in the interest of a free and open court system," she is prepared to disclose some of her personal information. Doc. 33. With regard to the materials Sedgwick utilized to conclude Plaintiff was not disabled, these documents shall not be sealed because (1) they are central to the resolution of this case and (2) Defendant failed to clearly define the type of serious injury it would incur if the documentation relating to Plaintiff's benefits determination was publicly accessible.

## V. CONCLUSION

For the reasons expressed above, Plaintiff's Motion for Summary Judgment [Doc. 23] will be granted in part and denied in part, Defendant's Cross-Motion for Summary Judgment [Doc. 27] will be denied and Defendant's Motions to Seal [Docs. 31 & 34] will be granted in part and denied in part.

An appropriate order will be entered.

Date: June 24, 2011                          s/ Noel L. Hillman
At Camden, New Jersey                  NOEL L. HILLMAN, U.S.D.J.